16-3310
Citizens United v. Schneiderman

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
_____

August Term, 2017

(Argued: August 21, 2017　　　　　　　　Decided: February 15, 2018)

Docket No. 16-3310

_____

CITIZENS UNITED AND CITIZENS UNITED FOUNDATION,

*Plaintiffs-Appellants*,

v.

ERIC T. SCHNEIDERMAN, in his official capacity as New York Attorney
General,

*Defendant-Appellee.*

_____

Before: NEWMAN, LEVAL, and POOLER, *Circuit Judges*.

Appeal from United States District Court for the Southern District of New

York (Sidney H. Stein, *J.*) holding that New York State's requirement that

registered charities disclose their donors did not run afoul of the First

Amendment, that federal tax laws do not preempt it, that due process claims concerning its implementation were not ripe, that the Attorney General's regulations including 501(c)(4) organizations in the definition of "charitable organization" were not ultra vires, and that therefore Appellants' amended complaint should be dismissed. We find that the mere requirement on a tax-exempt organization to disclose its donor list to a state's authority charged with regulating non-profits does not impermissibly chill speech or assembly rights. Nor does it operate as a prior restraint on non-profits' solicitation of donations. Finding all of Appellants' claims to be without merit, we AFFIRM the dismissal of all claims. As for the due process claim, we REVERSE the district court's finding that the claim was not ripe, and REMAND directing that the claim be DISMISSED with prejudice for failure to state a valid claim.

Affirmed in part and reversed in part.

_____

MICHAEL BOOS, Citizens United & Citizens United Foundation, Fairfax, VA, *for Plaintiffs-Appellants Citizens United & Citizens United Foundation.*

Donald F. McGahn, James Burnham, Andrew Bentz, Jones Day, Washington, DC (*on the brief*), *for Plaintiffs-Appellants Citizens United & Citizens United Foundation.*

BARBARA D. UNDERWOOD, Solicitor General of New York (Steven C. Wu, Deputy Solicitor General, Matthew W. Grieco, Assistant Solicitor General, *on the brief*), New York, N.Y., *for Defendant-Appellee Eric T. Schneiderman, Attorney General of the State of New York*

Derek L. Shaffer, William A. Burck, Quinn Emanuel Urquhart & Sullivan, LLP, Washington, D.C., *for amicus curiae in support of Plaintiffs-Appellants Citizens United & Citizens United Foundation.*

William J. Olson, Herbert W. Titus, John S. Miles, Jeremiah L. Morgan, Robert J. Olson, William J. Olson, P.C., Vienna, VA, Joseph W. Miller, U.S. Justice Foundation, Ramona, CA, and Mark J. Fitzgibbons, Manassas, VA, *for amici curiae in support of Plaintiffs-Appellants Citizens United & Citizens United Foundation.*

Paul M. Smith, The Campaign Legal Center, Washington, D.C., *amicus curiae in support of Defendant-Appellee Eric T. Schneiderman, Attorney General of the State of New York*

POOLER, *Circuit Judge*:

Plaintiffs-Appellants Citizens United and Citizens United

Foundation ("Appellants") sue Attorney General Eric Schneiderman for the

3

regulations promulgated by his office that require non-profit organizations to disclose their donors on a yearly basis. Appellants primary claim is that these regulations violate the First Amendment. They argue that the regulations do so in two ways: by creating a climate of fear among donors that limits their ability to raise the funds to promote controversial causes and by operating as a prior restraint on their ability to ask for money. Appellants also argue that these regulations are preempted by the Internal Revenue Code's disclosure rules and that the Attorney General went beyond his authority by including 501(c)(4) organizations in the regulations' definition of "charitable organization." In recent years, the Attorney General has begun to more zealously enforce the regulations. Appellants urge that having done so without prior notice amounts to a violation of the Due Process Clause of the Fourteenth Amendment. The District Court for the Southern District of New York (Sidney H. Stein, *J.*) dismissed all of these claims for failure to state a claim except the last, which it dismissed as unripe. We find that the due process claim was ripe, and that all claims should be dismissed for failure to state a claim. We therefore affirm the dismissal of all claims except the due process claim, reverse the dismissal without prejudice of that claim,

4

order that claim to be dismissed with prejudice, and remand for entry of a revised judgment.

## BACKGROUND

Appellants are two non-profit organizations with nearly identical names that promote a common perspective through complementary organizational channels. Citizens United Foundation is exempted from taxation under Section 501(c)(3) of the Internal Revenue Code ("IRC"), while Citizens United simpliciter is exempted under Section 501(c)(4). 26 U.S.C. §§ 501(c)(3), (c)(4). Under the IRC, donors to 501(c)(3)s[1] like Citizens United can deduct their contributions, but their money cannot pay for an organization a "substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation" or which "participate[s] in, or intervene[s] in…any political campaign on behalf of (or in opposition to) any candidate for public office." 26 U.S.C. §§ 170(a), (c)(2), 501(c)(3). Citizens United Foundation and other 501(c)(4)s have more leeway to enter the political arena, but their donors cannot take the

---

[1] We refer to organizations exempted under Section 501(c)(3) of the IRC as "501(c)(3)s" and those exempted under Section 501(c)(4) as "501(c)(4)s"

charitable donation deduction (though they can deduct donations as business expenses if applicable). 26 U.S.C. § 501(c)(4); "Donations to Section 501(c)(4) Organizations," IRS.gov (Aug 27, 2017), https://www.irs.gov/charities-non-profits/other-non-profits/donations-to-section-501c4-organizations.

Citizens United Foundation "produces educational films that document world leaders and events," including documentaries on Ronald Reagan and Pope John Paul II. Appellant's Br. at 5-6. Citizens United also produces films, but its productions include content that would run afoul of Section 501(c)(3)'s proscription on political advocacy. One of these films, "Hillary: the Movie," caused the controversy that led to the highly-publicized recent Supreme Court decision striking down a number of campaign finance laws on First Amendment grounds. *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010) ("*Citizens United v. FEC*").

It is not the regulation of how Appellants spend their money but of how they obtain it that concerns us here. The IRC requires both 501(c)(3)s and 501(c)(4)s—that is, both Citizens United and Citizens United Foundation—to yearly apprise the Internal Revenue Service ("IRS") of their donors. More

6

specifically, non-profits like Appellants must submit Form 990 with each year's taxes, and Form 990 includes Schedule B, which consists of a list of the organization's donors, the donors' addresses, and the amounts of their donations. 26 U.S.C. § 6104(d)(3)(A). Under the IRC, the IRS must keep the information on Schedule B confidential. *Id.*

Appellants, moreover, are subject to New York's regulations on non-profits. Although domiciled in Virginia, they seek contributions from supporters all over the United States, including New York. The laws of New York require any "charitable organization" to register with the Attorney General before permitting such organizations to ask for money in its confines. N.Y. Exec. Law §§ 172(1), 172-d(10). Under the Attorney General's regulations, Appellants both qualify as "charitable organizations." 13 N.Y.C.R.R. §§ 90.1(a), 90.2; *see also* N.Y. Exec. Law § 177(1) (giving the Attorney General power to "make rules and regulations necessary for the administration" of New York's non-profit laws).

To remain in good standing, a charitable organization seeking the money of like-minded New Yorkers must, after registration, submit a set of yearly disclosures. N.Y. Exec. Law § 172-b. The Attorney General's regulations have

7

long required that a charitable organization's annual disclosures include a copy of the IRS Form 990 and all of its schedules. 13 N.Y.C.R.R. § 91.5(C)(3)(1)(a).[2] His regulations also require those annual disclosures to be public unless they are "exempt from disclosure pursuant to State or Federal law," 13 N.Y.C.R.R. § 96.2, as Schedules B are. 26 U.S.C. § 6104(d)(3)(A).

Both Appellants registered with the Attorney General in 1995 and have submitted disclosures every year since then. They have always included IRS Forms 990 in their disclosures, but they have only ever submitted the first page of their Schedules B—omitting the parts identifying donors. Prior to 2013, they had heard no complaint from the Attorney General about this practice.

In 2013, Attorney General Schneiderman served deficiency notices on Appellants notifying them that they had failed to comply with the yearly disclosure requirements. Even after being warned of the potential consequences, Appellants have refused to submit more than the first page of their Schedules B. They have received a deficiency notice each year since 2013. Matters have not

---

[2] Appellants contend that a 2006 regulatory amendment removed the requirement that a Schedule B be included, but those changes actually *expanded* the requirement to all Form 990 schedules. *See* 40 N.Y. State Reg. 19 (Oct. 4, 2006).

escalated beyond that point, but the Attorney General could shift at any time from stern reminders to levying fines of $100 a day and eventually revocation of Appellants' New York solicitation privileges. *See* N.Y. Exec. Law § 177(2).

In 2014, Appellants endeavored to avoid this potential consequence by filing suit in the Southern District of New York challenging the Attorney General's requirements. Their complaint pointed to multiple purported faults. By requiring disclosure before allowing them to ask for money, Appellants argued, New York created an unconstitutional prior restraint on their speech—effectively setting up a proto-censorship office for those who need New Yorkers' money to get their message out. Moreover, Appellants claimed that by collecting lists of names associated with political preferences that he could release at any time, the Attorney General holds the unconstitutional power to intimidate donors from paying for the communication of their views. Appellants also alleged that it was beyond the Attorney General's powers under New York law to classify 501(c)(4)s as "charitable organizations" and that, on preemption grounds, it was beyond his powers to duplicate the federal government's disclosure requirements.

9

Finally, Appellants asserted that the unannounced elevation of enforcement was a due process violation.

After denying a preliminary injunction and giving Appellants leave to amend, the district court granted the Attorney General's motion to dismiss the entire complaint. In doing so, it found that the complaint failed to state any First Amendment, preemption, or New York constitutional violations and that the due process claim was not ripe for review. The Court therefore dismissed the due process claim sua sponte for lack of subject matter jurisdiction. Judgment was entered August 29, 2016. *Citizens United v. Schneiderman*, 203 F. Supp. 3d 397 (S.D.N.Y. 2016).

Appellants timely appealed the district court's judgment, challenging all of these determinations.


**DISCUSSION**

**I. Standard of Review**

We review appeals from motions to dismiss under Rule 12(b)(6) (failure to state a claim) de novo. *See, e.g., Harris v. Mills*, 572 F.3d 66, 71 (2d Cir. 2009). To

survive a motion to dismiss, a complaint need only provide "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). For Appellants to "nudge[] their claims across the line from conceivable to plausible," they must "raise a reasonable expectation that discovery will reveal evidence" of the wrongdoing alleged, "even if it strikes a savvy judge that actual proof of those facts is improbable." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570, 556 (2007).

On appeal from dismissal for lack of subject matter jurisdiction, we review legal conclusions de novo and factual findings for clear error. *Makarova v. U.S.*, 201 F.3d 110, 113 (2d Cir. 2000).

**II. First Amendment Claims**

Appellants challenge the Attorney General's regulations under the First Amendment using two distinct theories. First, they claim that the regulations intimidate potential donors from contributing to them. Doing so allegedly undermines Appellants ability to engage in expression by cutting off their

11

material support. Appellants advance this theory both as a facial and an as-applied challenge. Second, they claim that the regulations operate as a presumptively unconstitutional prior restraint on their ability to solicit donations. Neither of these theories is convincing.

**A. Does Disclosure Chill Donors' Expression?**

The basis of Appellants' first challenge is an analogy to the landmark decision in *National Association for the Advancement of Colored People v. State of Alabama ex rel. Patterson*, 357 U.S. 449 (1958). That case involved a state court's order requiring the NAACP to reveal the names and addresses of its members. *Id.* at 451. The Supreme Court held that, as applied to the NAACP, the disclosure requirement violated the First Amendment right to association, which is "an inseparable aspect of…freedom of speech." *Id.* at 460. It reasoned that "[i]nviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs." *Id.* at 462. NAACP members rightly feared violent retaliation from white supremacists for their membership in an

12

organization then actively fighting to overthrow Jim Crow. *Id.* Ample evidence of past retaliation and threats had been presented to the Court. Requiring the NAACP to turn over its member list to a state government that would very likely make that information available to violent white supremacist organizations, the Court concluded, would reasonably prevent at least some of those members from engaging in further speech and/or association. *Id.* at 462-63. Such chilling of expression is repugnant to the First Amendment. It can only be justified when the state's interest outweighs the harm to expression and association interests, as Alabama's did not. *Id.* at 463-66.

According to Appellants, New York's disclosure requirements, if enforced, would have a similarly chilling effect on their ability to communicate their views. They allege that, through their outspoken political advocacy, Appellants have "achieved a special measure of notoriety in recent years," having been called "an enemy of the people" by political opponents and even having "earned special enmity from the Attorney General himself." Appellant's Br. at 41. Their donors apparently fear having their names associated with the controversial beliefs they pay to promulgate. Appellants thus encourage us to apply strict scrutiny and to

13

hold that any mandatory disclosure of a member or donor list is unconstitutional absent a compelling government interest and narrowly drawn regulations furthering that interest. Whether as the basis of an as-applied or facial challenge, they posit that this test compels the result that the regulations must be struck down.

But the law is not as Appellants characterize it.

We only invoke strict scrutiny in First Amendment cases where a law "applies to particular speech because of the topic discussed or the idea or message expressed" or "though facially content neutral…cannot be justified without reference to the content of the regulated speech," including preventing expression from disfavored speakers. *Reed v. Town of Gilbert, Arizona*, 135 S. Ct. 2218, 2227 (2015); *see also Citizens United v. FEC*, 558 U.S. at 340 ("Prohibited, too, are restrictions distinguishing among different speakers…"). Content-neutral speech regulations receive exacting, or "intermediate," scrutiny. *See, e.g., City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 428 (1993). This includes neutral disclosure requirements. *See Citizens United v. FEC*, 558 U.S. at 366-67; *see also Doe v. Reed*, 561 U.S. 186, 196 (2010); *Buckley v. Valeo*, 424 U.S. 1, 64 (1976).

Appellants urge that exacting scrutiny has been reserved for disclosure requirements in elections and anti-corruption contexts, whereas strict scrutiny has been used for similar burdens on charitable giving. We disagree, and we see no reason to expand strict scrutiny in the way Appellants suggest. Disclosure requirements are not inherently content-based nor do they inherently discriminate among speakers. In most circumstances they will be a less burdensome alternative to more restrictive speech regulations. For this reason, they are not only reviewed using a lower degree of scrutiny, they are routinely upheld. *See Citizens United v. FEC*, 558 U.S. 366-67 (discussing the standard and collecting cases). Additionally, election law deals with political speech, which receives special consideration under the First Amendment. *See id.* at 339-40; *Meyer v. Grant*, 486 U.S. 414, 425 (1988). If disclosure requirements receive only exacting scrutiny in *that* circumstance, we cannot see why they should receive closer scrutiny elsewhere.

We will apply exacting scrutiny, then, which requires a "substantial relation between the disclosure requirement and a sufficiently important governmental interest" where "the strength of the governmental interest" is

15

commensurate with "the seriousness of the actual burden on First Amendment rights." *Reed*, 561 U.S. at 196 (internal citations and punctuation removed).

The Attorney General justifies the disclosure regulations by appealing to his responsibility to protect the public from fraud and self-dealing among tax-exempt organizations. He points out that "[k]nowing the source and amount of large donations can reveal whether a charity is…doing business with an entity associated with a major donor." Appellee's Br. at 45. The information in a Schedule B also permits detection of schemes such as the "intentional[] overstate[ment of] the value of noncash donations in order to justify excessive salaries or perquisites for its own executives." *Id.* Collecting donor information on a regular basis from all organizations "facilitates investigative efficiency," and can help the Charities Bureau to "obtain a complete picture of [the] charities' operations" and "flag suspicious activity" simply by using information already available to the IRS. *Id.* at 46-48. Because "[f]raud…is often revealed not by a single smoking gun but by a pattern of suspicious behavior," disclosure of the Schedule B can be "essential" to New York's interest in detecting fraud. *Id.* at 48-49.

We agree with the importance of the government's interests in ensuring organizations that receive special tax treatment do not abuse that privilege and of its interest in preventing those organizations from using donations for purposes other than those they represent to their donors and the public. Whether these are sufficiently important interests depends on how seriously they burden the First Amendment rights of non-profit organizations in New York.

An individual who seeks to advance a cause might reasonably hesitate knowing that an officer of the state will see that they have done so. Law enforcement officials have been known to abuse their power, and there is always a risk that an office charged with care of confidential information will spring a leak. A list of names in the hands of those with access to a state's coercive resources conjures up an uneasy number of troubling precedents.

But totalitarian tendencies do not lurk behind every instance of a state's collection of information about those within its jurisdiction. Any form of disclosure-based regulation—indeed, any regulation at all—comes with some risk of abuse. This background risk does not alone present constitutional problems. And requiring disclosure is not itself an evil: anonymity can protect

17

both those whose unpopular beliefs might subject them to retaliation and those who seek to avoid detection (and consequences) for deceptive or harmful activities that governments have legitimate interests in preventing. It follows that only where a plaintiff organization presents well pleaded facts of a "likelihood of a substantial restraint upon the exercise by [its] members of their right to freedom of association" or expression should we raise the First Amendment's shield of privacy. *NAACP*, 357 U.S. at 462; *see also Citizens United v. FEC*, 558 U.S. at 367 (requiring "reasonable probability that disclosure of [a group's] contributors' names will subject them to threats, harassment, or reprisals from either Government officials or private parties.") (internal citations omitted) (quoting *Buckley*, 424 U.S. at 74). To be "substantial" a restraint on associational rights must have sufficient heft that it outweighs the government's (and the public's) interests in disclosure. Otherwise, we will not interpose.

### 1. Facial Challenge

To succeed on a facial First Amendment challenge to the Attorney General's regulations under these standards, Appellants would have to plead

18

either that no application would be permissible or that a "substantial number" of its applications are likely to result in the prevention of material support for protected expression. *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n. 6 (2008). Since, as will become clear, Appellants cannot establish the unconstitutionality of these regulations as applied to them, they cannot possibly make out the case that the regulations have no permissible application. Our facial review thus focuses on whether too many of the applications interfere with expression for the First Amendment to tolerate. How many potential applications would be impermissible is made more determinate by the degree of scrutiny being applied. Exacting scrutiny, as we have already discussed, requires a "substantial relation between the disclosure requirement and a sufficiently important governmental interest." *Reed*, 561 U.S. at 196 (quoting *Citizens United v. FEC*, 558 U.S. at 366-67) (internal quotation marks omitted). Thus, if a substantial number of likely applications of the statute correspond to an important interest, a minority of potentially impermissible applications can be overlooked. The stronger the government interest and the weaker the First Amendment interest, the weaker the First Amendment claim.

19

*See id.; Davis v. Federal Election Commission*, 554 U.S. 724, 744 (2008); *Buckley*, 424 U.S. at 64.

Even interpreting the pleadings in the light most favorable to Appellants, the small extent of speech chilling is more than commensurate with the government's goals. We have already articulated the important government interests at stake: preventing fraud and self-dealing in charities. The Attorney General's regulations clearly further those interests by making it easier to police for such fraud. While we think it plausible that some donors will find it intolerable for law enforcement officials to know where they have made donations, we see no reason to believe that this risk of speech chilling is more than that which comes with any disclosure regulation. In fact, all entities to which these requirements apply already comply with the federal law mandating that they submit the selfsame information to the IRS. Appellants offer nothing to suggest that their donors should more reasonably fear having their identities known to New York's Attorney General than known to the IRS.

We would be dealing with a more difficult question if these disclosures went beyond the officials in the Attorney General's office charged with enforcing

20

New York's charity regulations. Certainly if that office were to publicize donor lists, it would raise the stakes, even if it were to do so recklessly rather than intentionally. *Cf. Americans for Prosperity Foundation v. Harris*, 182 F. Supp. 3d 1049, 1057 (C.D. Cal. 2016) (describing systematic incompetence in keeping donor lists confidential of such a magnitude as to effectively amount to publication). Publication of member or donor lists is not per se impermissible under the First Amendment, of course. It may even be defensible on the grounds that it promotes the transparency necessary for full and open debate. *See Citizens United v. FEC*, 558 U.S. at 367 (discussing permissibility of public disclosure in elections context). But when information about one's donation to a group is available to the public, it is more plausible that people who are opposed to the mission of that group might make a donor suffer for having given to it.[3]

Appellants do attempt to portray turning over donors' identities to the Attorney General as tantamount to opening that list up to anybody interested in viewing it, but their pleadings do not support that leap. As discussed above,

---

[3] We would still require reason to believe that circumstances are sufficiently hostile that the likely chilling of speech would outweigh the government's interest in disclosures, of course. For this reason, an as-applied challenge will generally be the more proper way to call into question disclosure regulations.

applicable law prevents the Attorney General from publicizing lists of donors. Of course, there is always a risk somebody in the Attorney General's office will let confidential information slip notwithstanding an express prohibition. But if the sheer possibility that a government agent will fail to live up to her duties were enough for us to assume those duties are not binding, hardly any government action would withstand our positively philosophical skepticism.

Appellants' allegation "[u]pon information and belief" that the Attorney General has published Schedule B disclosures in the past, and so can be expected to do so in the future, does no more than conjure the specter of a leak. App'x at 251. A litigant cannot merely plop "upon information and belief" in front of a conclusory allegation and thereby render it non-conclusory. Those magic words will only make otherwise unsupported claims plausible when "the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (citations omitted). There is no reason Appellants could not find at least one inadvertent publication without any help from subpoenas, depositions, or interrogatories. They are, after

all, alleging *public* disclosures, which, by their very nature, would be easy to discover if they occurred. As it is, we are presented with the mere mention of the possibility of publication. That cannot be enough.

The allegation that the Attorney General will publicize donors' identities is not well pled, so we do not address how it would change the analysis.

### 2. As-Applied Challenge

Since they cannot rely on conclusory allegations that donors' identities will be released to a hostile public, Appellants' as-applied challenge must rely on harms they are likely to suffer solely because the Attorney General's office knows the identity of their donors. To reiterate, the alleged harms must be sufficiently likely and of a sufficient magnitude that they outweigh the governmental interest in policing charities for fraud and self-dealing. In *NAACP*, the Court was presented (in an appeal from a final judgment) with "an uncontroverted showing that on past occasions revelation of the identity of its rank-and-file members has exposed those members to economic reprisal, loss of employment, [and] threat of physical coercion," and it was well known at the

23

time that civil rights activists in Alabama and elsewhere had been beaten and/or killed. 357 U.S. at 462. The speech chilling likely to result from these harrowing and near-certain threats of harm easily outweighed the state's asserted interest in preventing out-of-state corporations from conducting in-state business, on which the Court did not even think "the disclosure of the names of petitioner's rank-and-file members ha[d] a substantial bearing." *Id.* at 464-65.

In this case, all we have to go on is a bare assertion that the Attorney General has a vendetta against Appellants. Appellants have not even pled that the Attorney General will turn that alleged bile into untoward interference with the material support for Appellants' expression.[4] That is a far cry from the clear and present danger that white supremacist vigilantes and their abettors in the Alabama state government presented to members of the NAACP in the 1950s.

Meanwhile, and unlike the Court in *NAACP*, we have already concluded that the Attorney General's regulations are substantially related to the important interest in keeping non-profit organizations honest. Our balancing task is easy.

---

[4] It does seem plausible, given the nature of the regulations, that the Attorney General would prevent donors from funding expression when those donors commit fraud or engage in self-dealing. But the First Amendment does not prevent anti-fraud enforcement.

We have no problem concluding that the regulations in front of us do not impermissibly chill the speech of Appellants or their donors.

**B. Prior Restraint**

Appellants further argue that by being forced to register with the state before soliciting those donations and then to file a yearly list of donors to remain in good standing, they have been restrained (or will likely be restrained) from further solicitation. They contend that under the prior restraint doctrine the registration and disclosure requirements should be facially presumed unconstitutional.

We think the regulations at issue here are not the sort of prior restraint on speech that the First Amendment presumes unconstitutional.

As first developed in England and imported to the colonial United States, the right to freedom of expression amounted only to "laying no *previous* restraints upon publications, and not in freedom from censure for criminal matter when published." 4 WILLIAM BLACKSTONE, COMMENTARIES *152 (emphasis in original); *see also Grosjean v. American Press Co.*, 297 U.S. 233, 245-48

(1936) (recounting history); Thomas I. Emerson, "The Doctrine of Prior Restraint," 20 *L & Contemp. Problems* 648, 650-52 (1955) (same). Over the course of the 20th century, the more familiar multi-tiered scrutiny regime that applies to nearly every action by a federal or state government that has any impact on expression superseded the common law approach. Nevertheless, it has remained well established that prior restraints constitute "the most serious and the least tolerable infringement" on our freedoms of speech and press. *Nebraska Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976); *see also Near v. Minnesota ex rel. Olson*, 283 U.S. 697, 713 (1931) ("[I]t has been generally, if not universally, considered that it is the chief purpose of the [First Amendment's] guaranty to prevent previous restraints."). As such, "[a]ny system of prior restraints of expression…bear[s] a heavy presumption against its constitutional validity" once a facial challenge to it is leveled. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963); *see also FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 225 (1990).

If the special opprobrium prior restraints have received since the 17th Century is to maintain its force, we must guard against the doctrine's thinning by overextension. We have previously defined a prior restraint as "a law, regulation

or judicial order that suppresses speech—or provides for its suppression at the discretion of government officials—on the basis of the speech's content and in advance of its actual expression." *United States v. Quattrone* 402 F.3d 304, 309 (2d Cir. 2005).[5] This definition reflects the two traditional types of prior restraint: (1) preventing the printed publication of disfavored information, *see, e.g.*, *New York*

[5] This circuit has leaned towards limiting the constitutional meaning of "prior restraints" to content-based regulations, although we have not tipped entirely in that direction, and have occasionally teetered away. *Compare Quattrone*, 402 F.3d at 309 *and In re G. & A. Books, Inc.*, 770 F.2d 288, 295-96 (2d Cir. 1985) ("Governmental action constitutes a prior restraint when it is directed to suppressing speech *because of its content* before the speech is communicated.") (emphasis added) *with Hobbs v. County of Westchester*, 397 F.3d 133, 148 (2d Cir. 2005) (defining a prior restraint as "*any* regulation that gives public officials the power to deny use of a forum in advance of actual expression.") (emphasis added, citations and brackets omitted). The Supreme Court has also suggested, without deciding definitively, that being content-based is a prerequisite for prior restraints. *Compare Alexander*, 509 U.S. at 566 (1993) (Kennedy, J., dissenting) ("In its simple, most blatant form, a prior restraint is a law which requires submission of speech to an official who may grant or deny permission to utter or publish it *based upon its contents*.") (emphasis added) *and Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 555-56 (1975) (discussing time, place, and manner restrictions as if they would be exceptions to an application of prior restraint doctrine) *with Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 129 (1992) (finding an ordinance "requiring a permit and a fee before authorizing public speaking, parades, or assemblies" was a prior restraint without considering whether content-based or not). We continue to lean towards facial review only applying to content-based restrictions (or restrictions with an undue risk of being content-based due to the unchecked power they grant to their enforcers), but we need not decide the issue definitively here.

*Times Co. v. United States*, 403 U.S. 713 (1971) (*Pentagon Papers*), and (2) a facially-neutral law that sets up an administrative apparatus with the power and discretion to weed out disfavored expression before it occurs, *see, e.g., Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). These types correspond to facial challenges for content-based restrictions and to facial overbreadth challenges based on vagueness, with the added element that the regulation prevents speech rather than merely burdening it. *Cf., e.g., Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board*, 502 U.S. 105 (1991) (facial challenge to content-based speech regulation); *Reno v. American Civil Liberties Union*, 521 U.S. 844 (1997) (facial overbreadth challenge to vague speech regulation). The unequalled power of the presumption against prior restraint is best reserved for situations that closely resemble these two clear cases.[6]

---

[6] It hardly needs to be said that just because a disclosure requirement is not a prior restraint does not mean it is not subject to First Amendment scrutiny or that that scrutiny will be toothless. A recent solicitation case at the Supreme Court struck down licensing and disclosure requirements applying exacting scrutiny standard without directly invoking prior restraint doctrine *Watchtower Bible and Tract Society of New York, Inc. v. Village of Stratton*, 536 U.S. 150, 164-69 (2002).

Applying prior restraint scrutiny in the manner that Appellants advocate would stretch the doctrine beyond what it can bear. An outright ban is not in front of us, so the best they can do is to portray the New York charity regulations as an impermissible apparatus for censorship. Appellants do not challenge the minimal one-time registration requirements that they complied with decades ago in order to be permitted to begin soliciting donations in New York. *See* 13 N.Y.C.R.R. § 91.4(a)(1)-(5). Instead, the provision at issue requires non-profits like Appellants to disclose their donors on a yearly basis. 13 N.Y.C.R.R. § 91.5(c). It does so without interrupting their solicitation activities. *Id.* The disclosure requirement itself clearly cannot be a prior restraint, since it does not restrain speech. However, non-compliance with the (content-neutral) disclosure requirement can, after opportunity to cure, result in a withholding of permission to solicit. *See* N.Y. Exec. Law § 177(2)(a) (giving the Attorney General the ability to remove permission to solicit in the face of non-compliance); N.Y. Exec. Law § 172-b(5) (outlining the requirements to respond to a deficiency notice). So the basis of Appellants' prior restraint challenge must be that the Attorney General

has the discretion to *withdraw* permission to solicit if they do not comply with the yearly filing requirements.

Facially content-neutral laws that require permits or licenses of individuals or entities engaged in certain forms of expression only constitute prior restraints when they (1) disallow that expression unless it has previous permission from a government official[7] and (2) vest that official with enough discretion that it could be abused. *See Forsyth*, 505 U.S. at 130-31; *FW/PBS*, 493 U.S. at 226; *City of Lakewood v. Plain Dealer Publishing Co.*, 486 U.S. 750, 757 (1988); *Children First Foundation, Inc. v. Fiala*, 790 F.3d 328, 342-43 (2d Cir. 2015), *opinion withdrawn and superseded on rehearing in part by Children First Foundation, Inc. v. Fiala*, 611 F. App'x 741 (2d Cir. 2015).; *Amidon v. Student Association of State University of N.Y. at Albany*, 508 F.3d 94, 103 (2d Cir. 2007). The latter requirement is crucial. Too much space for censorial judgment creates a bureaucracy with a bias towards censorship, especially of the controversial expression most in need of constitutional protection. *See* 2 Smolla & Nimmer on Freedom of Speech § 15:10 (3d ed. 1996) (collecting sources). It risks making a facially content-neutral

---

[7] Undue delay in approval amounts to an effective restriction. *See, e.g., FW/PBS*, 493 U.S. at 226.

regime content-based in practice. Petty power can lead to favoritism (in exchange for material gain and otherwise), an impenetrable thicket of pretext, and self-censorship among those intimidated by these bureaucratic obstacles to expression. *See Children First Foundation*, 790 F.3d at 343. Establishing "narrow, objective, and definite standards" prevents these ills. *Id.* at 342; *see also Forsyth*, 505 U.S. at 130-31.

What Appellants complain of is not a proto-censorship regime but the inevitability of prosecutorial discretion with finite enforcement resources. Prevention of their solicitation can only arise if they fail to comply with content-neutral, unambiguous, and narrowly drawn standards for disclosure—they need only submit a document they already prepare and submit to the IRS—and then only after warning and opportunity to cure. It is, in other words, a remedial measure, not ex ante censorship. Moreover, without any indication of bias in application, we cannot view the Attorney General's discretion to determine which groups receive deficiency notices or face penalties for failing to file Schedule B as anything but a necessary manifestation of the need to prioritize certain enforcement efforts over others. Aside from Appellants' bare

31

protestations, we have no reason to conclude that these objective and definite disclosure requirements are being applied in anything but a uniformly content-neutral fashion. *See Children First Foundation*, 790 F.3d at 345.

## III.   Due Process Claim

Appellants also argued below that the Attorney General did not live up to the standards of due process when he decided to enforce the disclosure rules without notifying the non-profits that he had. The district court dismissed this claim sua sponte for lack of ripeness. *Citizens United v. Schneiderman*, 203 F. Supp. 3d at 408-10. We disagree that the issue is not ripe, but we find that the due process claim fails on the merits.

Whether a dispute is ripe for judicial decision depends on two factors: "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Sharkey v. Quarantillo*, 541 F.3d 75, 89 (2d Cir. 2008) (quoting *National Park Hospitality Association v. Department of Interior*, 538 U.S. 803, 808 (2003)). "[B]ecause the dispute presents legal questions and there is a concrete dispute between the parties, the issues are fit for judicial decision." *Id.*

32

Appellants dispute the Attorney General's right even to send them deficiency notices, and the Attorney General has already sent them at least one notice. It is a legal question actually disputed between the parties whether he had to notify Appellants (and others) that their failure to file a Schedule B could trigger this first remedial step. Withholding court consideration would require Appellants to risk losing their permission to solicit in New York before litigating this issue. It would also leave the Attorney General open to that litigation if he followed through on withdrawing that permission. We see no reason to require the parties to go through these further formalities in order to determine whether issuance of the deficiency notice was legitimate.

Turning to the merits: the Due Process Clause of the Fourteenth Amendment mandates that "laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Federal Communications Commission v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). When an executive agency changes which behavior violates its regulations, it must provide notice that it has done so before faulting any of those it regulates for engaging in the newly verboten behavior. *Id.* at 254-58. However, a change in

33

enforcement priorities does not trigger a notice requirement as long as that change does not alter the standard of behavior required by law. If it did, then any new influx of public money for law enforcement and any change in enforcement strategy would require buying advertising space to broadcast a crackdown. Forbearance in enforcement of a law does not thereby nullify its requirements, nor does more effective enforcement heighten them.

The Attorney General has not changed his definition of which behavior violates his regulations; he has at most stepped up his enforcement. Appellants had been required to file their Schedules B for nearly a decade when Attorney General Schneiderman took office, even if they had gotten away with failing to do so before.

## IV.    Preemption Claim

We find Appellants' preemption claim equally unconvincing. According to them, New York's regulations "frustrate the full effectiveness" of the Internal Revenue Code's protection of non-profit donors' confidentiality, including provisions that govern the conditions under which the IRS can share donor

34

information with state officials. Appellant's Br. at 46-49 (quoting *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 106 (1992)). We entirely agree with the Ninth Circuit's evaluation of this issue when confronted with a similar set of disclosure requirements:

> These subsections may support an argument that Congress sought to regulate the disclosures that the IRS may make, but they do not broadly prohibit other government entities from seeking that information directly from the organization. Nor do they create a pervasive scheme of privacy protections.

*Center for Competitive Politics*, 784 F.3d at 1319. The IRC does not preempt New York's disclosure requirements.

**V. New York State Constitutional Claim**

Finally, we agree with the district court that it was fully within the Attorney General's powers to include 501(c)(4)s in the definition of "charitable organization" over which he has purview. Appellants concede that under New York law, the Attorney General may "fill in the interstices in the legislative product." *Allstate Insurance Co. v. Rivera*, 12 N.Y.3d 602, 608 (2009) (citation omitted). And Appellants cannot deny the Attorney General's power to "adopt

35

regulations that go beyond the text of its enabling legislation, provided they are not inconsistent with the statutory language or its underlying purposes." *Greater N.Y. Taxi Association v. N.Y.C. Taxi & Limousine Commission*, 25 N.Y.3d 600, 608 (2015) (citation and brackets omitted). We do not think the statutory definition of "charitable organization" as "[a]ny benevolent, philanthropic, patriotic, or eleemosynary person or one purporting to be such" clearly precludes 501(c)(4)s from its ambit. N.Y. Exec. Law § 171-a(1). Nor do we think including 501(c)(4)s goes against the purpose of a statutory scheme intended to prevent non-profit organizations from misleading well-meaning New York donors or misusing tax-exempt status. *See* N.Y. Exec. Law § 172-d. Indeed, *excluding* 501(c)(4)s from scrutiny would likely undermine this purpose. It is not unheard of for 501(c)(3)s and 501(c)(4)s to work in tandem and even to have nearly identical names. If the latter were able to avoid supervision, such organizations could serve as shells to keep donors anonymous to the former. The Attorney General's regulations are thus well within his powers.

## CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court dismissing all claims except the due process claim, REVERSE the dismissal without prejudice of the due process claim for lack of ripeness, order that claim to be DISMISSED with prejudice for failure to state a valid claim, and REMAND for entry of a revised judgment.